McGREGOR W. SCOTT
United States Attorney
STANLEY A. BOONE
Assistant U.S. Attorney
4401 Federal Building
2500 Tulare Street
Fresno, California 93721
Telephone: (559) 497-4000

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 01: 06-CR-00426 OWW |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT'S OBJECTIONS TO |
| v. | ) | PRESENTENCE INVESTIGATION |
| | ) | REPORT and GOVERNMENT'S MOTION |
| | ) | FOR UPWARD DEPARTURE PURSUANT |
| | ) | TO SECTION 3553 OF TITLE 18, |
| | ) | UNITED STATES CODE AND THE |
| TALAL ALI CHAMMOUT, | ) | SENTENCING GUIDELINES |
| | ) | |
| | ) | DATE: October 9, 2007 |
| | ) | TIME: 3:00 p.m. |
| | ) | PLACE: Courtroom Three |
| Defendant. | ) | Honorable Oliver W. Wanger |
| | ) | |

TO THIS HONORABLE  COURT, DEFENDANT AND HIS ATTORNEY OF RECORD:

The United States of America, by and through its undersigned attorneys, McGregor W. Scott, United States Attorney, Stanley A. Boone, Assistant United States Attorney, respectfully responds to the defendant's formal objections to the presentence investigation report and also hereby requests an upward departure to ninety-seventy (97) months.

**A.   Objections Numbers 1, 2, 3, 7:**

These objections center around the probation officer's discussion of stinger missiles, rocket launchers and other forms of

1

weaponry which the defendant wished to purchase on behalf of others.  In essence, the defendant's objection is not an objection to the factual assertions as set forth by the probation but an "objection" that wishes the probation officer to say more about those facts.  Simply put forth, the defendant wishes to put his interpretation on the facts by means of the probation report.  For example, the defendant requests that the probation officer include in the report that the defendant was not arrested until December 2006, fourteen (14) months after this conversation took place. This is clearly argument, and is simply not necessary for the PSR, as the PSR provides the date the conversation took place and when the defendant was arrested.  See PSR pg. 5, ¶ 13, and Page 1 ("Date of Arrest").

These "objections" are merely arguments of the defendant and are not an appropriate basis for the objection because nowhere in the PSR does the probation officer state that defendant purchased these items, only that the defendant wished to purchase these items.  Therefore, his objections are not appropriate objections but are argument appropriately reserved for a sentencing memorandum or argument at sentencing.  Despite this, the government will address these objections in the context of a sentencing memorandum. The defendant also asserts that such conduct was a result of sentencing entrapment.  Defendant's Objection at 2 (lns. 19-17-20) and 3 (lns 13-17).

Sentencing entrapment, or sentence factor manipulation, occurs when a defendant who is predisposed to commit a minor or lesser offense is entrapped into committing a greater offense subject to greater punishment.  United States v. Lopez, 106 F.3d 309 (9th

Cir. 1997).  A defendant bears the burden of proving sentencing entrapment by a preponderance of the evidence.  United States v. Naranjo, 52 F.3d 245, 250 (9th Cir. 1995) and United States v. Riewe, 165 F.3d 727, 729 (9th Cir. 1999)(defendant bears burden of proving sentencing entrapment by a preponderance of the evidence). In deciding whether a departure is warranted on the ground of imperfect entrapment, the district court must weigh the amount of inducement, the level of reluctance on the defendant's part, and who acted first.  United States v. McClelland, 72 F.3d 717, 726 (9th Cir. 1995).  United States v. Staufer, 38 F.3d 1103, 1106 (9th Cir. 1994).  The defendant also must establish that the government engaged in some form of misconduct, pressure, or coercion that caused a defendant to increase his criminal culpability. See United States v. Si, 343 F.3d 1116, 1128 (9th Cir. 2003) ("[i]n order to show sentencing entrapment, a defendant must show that the government engaged in outrageous official conduct which caused the individual to commit a more significant crime for which a greater penalty attaches"); United States v. Robinson, 94 F.3d 1325, 1329 (9th Cir. 1996)("A defendant who is unduly pressured by government agents to commit a crime involving more loss than he originally intended is entitled to a downward departure for sentencing entrapment.").  However, merely providing the suggestion or opportunity for a defendant to commit the offense does not amount to inducement. United States v. Mendoza-Prado, 314 F.3d 1099, 1102 (9th Cir. 2002).

Here, the defendant has clearly failed to met his burden by presenting no factual assertions or evidentiary proffer that he was entrapped for sentencing purposes.  The mere assertion by him that

3

he was entrapped for sentencing purposes is legally insufficient. However, in light of this inadequate record and failure to meet his burden of production and persuasion, the government, while not required to do so, will show that such factual assertions by the probation officer are correct and additionally that the defendant was entrapped for sentencing purposes.   In fact, the record will show that this defendant is a sophisticated dealer who appears to have connections overseas in the area of high-end weaponry and who had intimate knowledge of the sale of these types of weapons.[1]

**Record Regarding the Sale of Weapons:**

In December of 2004, the defendant purchased from the confidential informant a number of military items which the defendant believed were stolen military items.  These believed stolen item included two sets of night vision goggles, one small arms protective insert, two chemical suits, two ballistic vests, one set of lower torso fragmentation armor and four pairs of hot weather combat boots.  See Plea agreement filed June 7, 2007, Factual Basis, ¶ 5.  The discussions regarding this sale began in late October 2004. After the December 2004 sale of stolen military equipment, conversations began with the defendant in or around September 2005, about purchasing rocket launchers.

On September 23, 2005 the confidential informant made contact with the defendant and the topic of rocket launchers was discussed.

---

[1]  In addition, the defendant purchased five Beretta pistols he also believed were stolen from the military plus his possession of forty other firearms.

See Attached Exhibit 1.[2]  The confidential informant explained to the defendant that rocket launchers were hard to obtain, but they do become available at times.  Also during this meeting, the defendant asked the informant if he would be able to get Beretta handguns and commented to the informant that Berettas come in crates.  On October 18, 2005, the informant made contact with the defendant during which time he showed the defendant an Internet print-out of a shoulder-fired AT-4 Light Anti-Tank Weapon.  After looking at the picture, the defendant stated that he wanted them, but would prefer a delivery in Iraq.  The defendant also told the informant that he wanted an "M16 with a grenade launcher."  Before departing, the defendant said he could put everything in a container in Iraq and "cross it."

On November 11, 2005, the informant made contact with the defendant and told the defendant that the AT-4's could be obtained locally.  The informant then offered to drive them anywhere the defendant wanted.  The defendant replied, "you can't drive it overseas," explaining, "I tried Canada and I tried Mexico."  The defendant then told the informant that another option would be flying a plane out of the United States, or shipping a car with the weapons inside.  On November 30, 2005, the informant made contact with the defendant and told the defendant that a delivery of AT-4

---

[2]  The evidence of the factual assertions set forth in this responses to these objection are found in the search warrant affidavit (Exhibit 1) and audio tapes which the government intends to play at the sentencing proceeding.  The exhibits in support of this response are not being filed with the court but will be lodged for the record in order to protect their sensitive nature and the privacy of victims.  These exhibits will be hand believed to the court and counsel for the defendant.

weapons in Iraq could not be done, but a delivery to other countries was a possibility.  He specifically mentioned other countries in the Middle East where the United States has military bases.  The defendant replied, "near the border of Syria."  The informant asked the defendant if the United States had a base there, to which the defendant replied he believed they did.  Before departing, the defendant told the informant, "don't fucking stick me up and throw me in fucking prison for the rest of my life."

On January 6, 2006, the informant made contact with the defendant and told the defendant that a delivery of AT-4's to Syria would not be possible, but offered Jordan as an alternative country of delivery.  The defendant replied that Jordan would be acceptable and said they could use a "military car" to avoid detection.  The defendant said that the people who wanted the AT-4's worked for a foreign power, saying they were "top officials. . . they are government themselves."  The defendant closed the meeting with the informant saying, "things they'll take the most of is missile launchers, aircraft, aircraft missiles."

On February 23, 2006, the informant made contact with the defendant.  The informant told the defendant the black market price for a Stinger missile (a ground to air anti-aircraft missile system) was between $50,000 and $80,000, but the price was negotiable.  The defendant stated he would call his contacts overseas and inquire about how much they would be willing to pay. On March 6, 2006, the informant made contact with the defendant and engaged the defendant in further discussions concerning the AT-4's and Stinger missiles.  The defendant initially replied, "These guys want this stuff, if this ever gets out, you're dead, mother fucker.

I'm dealing with fucking presidents. I can't talk to them over the phone." The discussion then moved to which delivery location would work best for the weapons. The defendant initially stated, "whichever is easiest," but clarified, "if he can get it to the base in Iran, show me the stuff, he can get paid and everyone is gone." A later debrief of the confidential informant revealed the defendant wrote "Iran" and "Syria" on a dry erase board during the conversation. The defendant stated that he did not have a price he would be willing to pay yet, saying, "I have to talk to the other side first." Before departing, the defendant asked the informant for a print-out of the specifications of the AT-4's and Stinger missiles saying, "Bring me a picture of this article, what these things can do, I can't send it to them, bring this stuff and I'll manage anyway. Don't fold it, it has to go through some kind of machine."

On March 23, 2006, the defendant advised the informant a delivery of the AT-4's and Stinger missiles in Jordan would not be possible, saying, "They can't do it in Jordan... they don't trust the Jordanians." The informant then showed the defendant ten (10) pairs of armed forces desert combat boots that were for sale. The defendant subsequently paid the informant $100.00 for the boots. The informant then gave the defendant a price of $10,000 for five AT-4's and $50,000 for a Stinger missile. Before departing, the defendant stated he would be a "king" and would make lots of money if he could get the munitions to the Middle East.

On May 26, 2006, the informant made contact with the defendant. During the meeting, the informant showed the defendant a Polaroid photo of himself holding a Stinger missile and wearing a

7

gas mask.  The defendant remarked that he needed the Stinger in Iraq where he could smuggle it out, not in the United States.

On June 9, 2006, the informant made contact with the defendant and told him that his military contact for the missiles could ship them to the country of Turkey.  The defendant replied Turkey was too dangerous, stating that a person could get his head cut off for doing criminal acts.  The defendant then commented that Iraq would be best, given they have no government and smuggling weapons would therefore be much easier.  Before departing, the informant sold the defendant two armed forces gas masks for $100.

On June 30, 2006, the informant made contact with the defendant.  The informant told the defendant that his military supply friend was traveling to Iraq in seven days for a thirty-day assignment to Mosul, Iraq.  Further, the informant told the defendant the Stinger missiles would be available as long as his friend was there.  The informant then asked the defendant if he knew where Mosul was, to which the defendant replied in the affirmative.  The defendant stated that he needed thirty days to travel to the area and make the proper contacts for the deal.  On July 7, 2006, the informant made contact with the defendant.  The defendant asked the informant if he and his military supply friend were serious about the Stinger missiles, given they had been talking for months.  The informant told the defendant his friend would be leaving for Iraq the following day and would quickly ensure the Stinger missiles were moved to the city of Mosul.  The informant then asked the defendant for a down payment to start the process.  The defendant refused to provide a down payment, saying his people would have to try one out first to ensure they were not

being sold non-working munitions.  Then the defendant commented, "It will take two meetings to complete the deal...I will have to travel to at least three countries to get back so that no one knows I am there.  It will cost me twenty-thousand to make the trip."

On July 13, 2006, the informant made contact with the defendant.  The informant showed the defendant a printed email from his military supply friend purported to be in Iraq.  The email was again written by Fresno FBI JTTF personnel.  The email stated no initial money would be needed and that travel to Mosul should be easy.  The defendant read the email and handed it back to the informant. The informant asked the defendant if he was serious about purchasing the Stinger missiles to which the defendant replied, "Yes."  The defendant then asked the informant how long his friend was going to be in Iraq and the informant replied thirty days.  The defendant then stated his "guy," who does this kind of stuff, would be in the area of Iraq after August 8th.  The defendant asked for a phone number to contact confidential informant's military supply friend and the informant told the defendant he would provide a phone number at their next meeting.

On July 28, 2006, the informant made contact with the defendant.  The informant provided a printed email from his military supply friend in Iraq.  The email was again written by Fresno FBI JTTF personnel.  The email provided an international number for a Thuraya satellite phone purchased by the Fresno FBI. Thuraya satellite phones only work in the Middle East and Europe and are commonly used in those regions.  The informant told the defendant to make calls in the evening given his friend's work schedule.  The email also stated there were two girls that would

travel to Mosul and would cost $15.  The informant explained that was code language for two Stinger missiles being sent to Mosul at a cost of $15,000 for both.  The defendant asked the informant about the time difference between California and Iraq and the informant told the defendant he would find out for next time.

On August 4, 2006, the informant made contact with the defendant.  The informant told the defendant the time difference between California and Iraq was approximately eleven hours and explained to call around 9:00 a.m., California time, to reach his military supply friend.  The informant also told the defendant to use the code phrase, "It is hot in Lemoore right now," or the contact would hang up without speaking to him.

On August 29, 2006, the informant made contact with the defendant.  The informant asked the defendant if he had tried to call his military supply friend in Iraq and the defendant replied that he had tried many times, but could not get through.  The defendant then told the informant he was still interested in buying the Stinger missiles, but the best time to do it for him would be the "eleventh month," apparently meaning November.  The defendant then told the informant he would try to call the phone again in a couple of days.

On September 15, 2006, the  informant made contact with the defendant.  The  informant told the defendant that his military supply friend was returning from Iraq since he never received a call from the defendant.  The defendant then stated he called four times from an area near the Mexico border, but did not elaborate further.  To fulfill a past request, the  informant asked the defendant if he still wanted more bullet-proof vests.  The

10

defendant replied that he needed enough to supply an army.  The informant then agreed to bring four vests for the defendant to inspect.  Before departing, the defendant told the informant the gas masks he previously purchased did not work, but did not elaborate further.

On September 19, 2006, the  informant made contact with the defendant.  The informant told the defendant the bullet-proof vests he wanted were available and asked if he could handle 100-200 vests.  The defendant replied yes, but they would have to be delivered in Iraq.  The defendant then stated, "the thing they want most are the things that shoot down airplanes."  The defendant stated he would have to travel to Iraq in person to negotiate the deal though, as no one over there would complete the deal without his presence.  The defendant again stated he would be traveling "over there" in November and would be available to negotiate the sale then.

On October 4, 2006, the informant asked the defendant if he was still interested in the Beretta pistols he requested in the past.  The defendant replied, "Yes."  When the informant asked how many he wanted, the defendant replied he wanted all of them.  The informant told the defendant he would inquire about the price and get back to him. On October 18, 2006, the informant made telephonic contact with the defendant and told the defendant he had already sold several Beretta pistols for a price between $300-400, but there were twenty Beretta pistols available in used, but good condition. The defendant replied he wanted new pistols, and that used pistols should sell for only $150-200 each.  The informant then told the defendant he was still working on the price, but

would call him back at a later date.

On November 21, 2006 the informant made contact with the defendant.  In a whispered tone, the defendant asked if informant's military supply friend could meet with him again concerning the sale of missiles saying "they really need these over there."  The informant replied he would talk to his friend when he returned.

On December 7, 2006, the defendant purchased five (5) Berretta handguns from the informant.  The defendant was subsequently arrested.

It is clear that this defendant has an intimate knowledge of arms transactions.  While he did not purchase the AT-4's and stingers, he went to great efforts to acquire them.  Hence, the probation officer's report is accurate and defendant's objection must be overruled.

**B.   Response to Objections 4, 6 and 8:**

Next, the defendant objects to the probation officer's statements in the PSR regarding the defendant's propensity for violence.  Again, the defendant argues that factual assertion is correct but that more should be added.  For similar reasons, as described above, this objection is without merit and must be rejected.  However, a factual history is important in determining the defendant's repeated attempts to harm his ex-wife.  This defendant has had a violent history, which includes his ex-wife, as well as others, and is probative of his anger and why the discussions with the hitman were more likely than not to kill his ex-wife.

**a.   Lebanon Incident:**

In or around July 2004, the defendant physically assaulted

Ferial Chammout, also known as Ferial Ezzedine, in Lebanon.  While in Lebanon, the defendant physically struck the defendant's head with a crowbar causing severe injures that required medical attention.  See Exhibits 2, 3 and 4.  The defendant asserted that the defendant injured herself when she fell.  See Defendant's Exhibit A to Sentencing report, pg. 2.

The government contends that such injuries were incurred as a result of the defendant's violent character.  The defendant also threatened to kill his ex-wife if she returned to the United States with their children.  As a result, the defendant returned alone to the United States.  The defendant eventually allowed the children to return home as part of their divorce settlement.  The defendant counters that an official in Lebanon stated that no case existed. See Defendant's Exhibit A to Sentencing Memorandum filed September 14, 2007.  While the document provided by the defendant appears to be a possible governmental report, the report conclusion is simply unreliable and biased because the report offers little to no factual details such as how these two witness, Ali Hammoud and Farouk Fardon, were able to conclude that the defendant did not injure the victim.  In fact, the report never states that these witnesses were present at all times during the incident.  All the witnesses do is to deny any knowledge and state that they did not witness battery which is an assertion that a number of individuals could do when they are not present for a battery.  Accordingly, the report appears suspect and lacking of credibility.  The government intends to offer photographic evidence showing the extent to the wife's injuries.  See Exhibit 2.

13

**b.    Detroit Incident:**

Next, less than a year later, on or about March 19, 2005, the defendant was encountered in Dearborn, Michigan after he broke into his ex-wife's house.

On March 19, 2005, the FBI was conducting surveillance of the defendant in Dearborn, Michigan.  See Attached Exhibit 5 for evidence of the surveillance.  The surveillance began at the defendant brother's, Imad Chammout, residence.  At approximately 9:00 a.m, on that day, the defendant was surveilled leaving his brother's residence wearing blue pants, a beige and blue hooded windbreaker jacket, and tennis shoes.  He then got into a dark gray Dodge Durango bearing Michigan plates and proceeded to the area of Oakman Boulevard making loops in the vicinity of 6310 Oakman Boulevard, the residence of Ferial Chammout.  During this surveillance, the defendant was observed with the hood pulled up to cover his head with the drawstring cinched framing his face looking toward his right.  They did lose coverage of the defendant but then choose to set up surveillance in the vicinity of 6310 Oakman.  A couple of hours later, the defendant returned to the Oakman area. He looped around the grassy median and stopped in front of 6310 Oakman.  He was then observed exiting his vehicle with his hood covering his head and wearing sunglasses, and approaching the residence, where the defendant tried turning the door knob on the front door and nudging it with his shoulder.  The defendant then returned to the Durango and drove away.  He then drove a short distance stopping at the corner of Oakman and Henson, where he picked up a rock.  The defendant then got back into his vehicle and returned to 6310 Oakman where he left his vehicle.  He walked up

the driveway to the rear of the residence and then onto the rear porch where he placed his back against the house.  According to a witness, the defendant, wearing a tan jacket and gloves, broke a window in the rear of his ex-wife's house with the rock.  The defendant then returned to the front of the house where he was observed throwing a rock onto the grass median and returned to the rear of the home.  The defendant then reached through the broken window and opened the rear door entering the house.  The Dearborn Police were called and arrived on the scene.  When eventually encountered by the Dearborn Police officers, the defendant responded that this was his house and that he lived there.[3]  At the time, the defendant was wearing a tan jacket and gloves.  The house was his wife's house and was a house which he was not residing in, for at that time, he resided in California.

The defendant was eventually charged with Burglary in violation of Michigan law and was placed on one year of diversion.

**c.   Inquiry as to a Hitman:**

At the time of the sale of the stolen military equipment to the defendant in December 2004, the defendant was asked by the informant if there was anything else that he (the defendant) wanted.  In a whispered tone, the defendant asked the  informant for "a gun with a silencer."  On February 1, 2005, the  informant again made contact with the defendant and asked him if he was serious about the purchase of a gun with a silencer.  The defendant indicated that he was still interested in purchasing such a weapon.

---

[3]  At the time, the defendant was a resident of Tulare County, California and had never been a resident of his ex-wife's home. See PSR pg. 2 and PSR ¶ 55.

15

The  informant told the defendant that he would look into the cost for the items and contact him at a later date.  On February 23, 2005 the  informant made contact with the defendant and advised him that he had spoken to his contact at Lemoore Naval Air Station about obtaining a silencer for a pistol.  The  informant told the defendant that the silencer was controlled by someone who uses it to make money.  The defendant asked if this meant making "a hit." The  informant answered that it did.  The defendant then said, "there is some stuff that needs to be taken care of."  The defendant told the  informant that he wanted to meet this person. On February 25, 2005, a Special Agent of the FBI, acting in an undercover capacity and posing as a contract killer, telephonically contacted the defendant, through the  informant's cellular telephone.  The undercover agent went by the name of Vinnie.  The defendant willingly agreed to meet the undercover agent to discuss an inferred contract killing within the next several weeks.  The undercover agent advised the defendant that he would make arrangements to travel to California for that purpose. Approximately three weeks later the Dearborn incident took place. The defendant was charged with burglary and was placed on diversion for one year.  See PSR  ¶ 46.

On year later in March 2006, the defendant personally met with Vinnie, the FBI undercover agent.  During the meeting, the discussed what the contract killer could do for the defendant and how it could be done.  The defendant never identified the intended victim.  The next day the defendant met the undercover "hitman" and gave him $1,000 for his meeting.  He never contracted his services.

On May 8, 2006, the defendant asked the  informant to meet

16

again with "Vinnie."  See Exhibit 1 (Search warrant).  The defendant then asked the  informant, "Can I trust him?" The informant told the defendant that Vinnie could be trusted, saying, "He'll make it look like a robbery gone wrong."  Id.  The informant agreed to re-contact Vinnie on behalf of the defendant.  Id.  On May 26, 2006, the  informant told the defendant the he had spoken with Vinnie and that if the defendant wanted to use Vinnie's services that the defendant would have to get a hold of Vinnie soon because Vinnie was leaving the country in July.  Id.  Vinnie needed a phone number where Vinnie could call so that they could talk if the defendant wanted his services.  No future contacts were made regarding the hitman's use.

### 2.   MOTION FOR UPWARD DEPARTURE

**Upward Departure under Chapter Five and 18 U.S.C. § 3553 for His Role and the Conducted Surrounding the Case and this Defendant's Overall Character Justify a Sentence of Ninety-seven (97) Months**

Additionally, the government moves for an upward departure on two independent bases, and collectively, pursuant to Chapter Five of the United States Sentencing Guideline and Title 18, United States Code, Section 3553.  An upward departure would be warranted because the Guidelines do not take into account the defendant's conduct in this case nor this defendant's true character as described above and below and such factors are factors which are appropriate for this court to consider under 3553 of Title 18, United States Code.  Therefore, the government requests that this court exercise its discretion to increase the defendant's imprisonment to ninety-seven (97) months imprisonment.

A court may depart upward when there exists an "aggravating...

circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  18 U.S.C. § 3553(b); see also U.S.S.G. § 5K2.0.  A court may do so, however, only if the circumstance upon which it seeks to base its departure "is consistent with the sentencing factors prescribed by Congress. . . . " United States v. Pacheco-Osuna, 23 F.3d 269, 272 (9th Cir. 1994)(citing United States v. Lira-Barraza, 941 F.2d 745, 746 (9th Cir. 1991).  A departure is permitted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2046 (1996).  The government bears the burden to prove by a preponderance of the evidence that the circumstances of his case warrant an upward departure.  See generally United States v. Anders, 956 F.2d 907, 911 (9th Cir. 1992).

Further, under Title 18, United States Code, Section 3553(a), the court must look to:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence imposed

-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

-- (B) to afford adequate deterrence to criminal conduct;

-- (C) to protect the public from further crimes of the defendant; and

-- (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

18

Further, in determining a sentence under the Sentencing Guidelines on the basis of upward departure, the sentencing court engages in a four-step departure analysis: (1) it identifies which feature of the case potentially takes it outside the "heartland" of the Guidelines and makes it a special or unusual case; (2) it determines whether the Sentencing Commission has forbidden departures based on those features; (3) if not, it determines whether the Commission has encouraged departure based on those features; and (4) if not, it determines whether the Commission has discouraged departures based on those features. United States v. Connelly, 156 F.3d 978, 983 (9th Cir. 1998).

Here, the government is seeking an upward departure based upon Title 18, United States Code, Section 3553 and the United States Sentencing Guidelines and seeks the departure based upon the acts described above and well the defendant's following conduct:

1.   The bankruptcy fraud committed by him when he failed to disclose to the bankruptcy court and the Chapter 7 trustee assigned to his case $80,000 in cash held at a bank account at the Mandalay Bar Hotel in Las Vegas, Nevada. See Exhibits 6 and 7.  The monies were seized shortly after his arrest in December 2007;

2.   Violated a State Judicial order by Failing to Abide by the Condition to Not Possess Firearms by possessing firearms; See Exhibit 3 and

3.   His conduct towards other victims Manal and Pennie Viacrusis both physically and economically.  See Attached Exhibit

7.[4]

Therefore, this court would be warranted in imposing a sentence of ninety-seven months imprisonment for such conduct under both Chapter Five of the United States Sentencing Guidelines and 18 U.S.C. § 3553.

## CONCLUSION

Wherefore, for the reasons stated above, the court should impose an upward departure on the basis of this conduct.

Respectfully Submitted,

McGREGOR W. SCOTT
United States Attorney

DATED: 10/5/07              By    /s/ Stanley A. Boone
                                  STANLEY A. BOONE
                                  Assistant U.S. Attorney

---

[4]    This conduct is in addition to other acts in which the defendant has displayed a propensity for violence, wife includes the acts against his wife and his prior criminal convictions and encounters- his October 1994 conviction for assault with a deadly weapon (PSR ¶¶ 43-45) and other criminal encounters (PSR ¶¶ 39, 41).